C. N. Markle v. Commissioner.
Markle v. Commissioner
Docket No. 5439.
United States Tax Court
1946 Tax Ct. Memo LEXIS 232; 5 T.C.M. (CCH) 221; T.C.M. (RIA) 46069; March 28, 1946
Homer L. Bruce, Esq., 16th Floor, Niels Esperson Bldg., Houston, Texas, for the petitioner. James L. Backstrom, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax for the year 1941 in the amount of $84,387.65. The deficiency is due to respondent's determination that petitioner received amounts under a distribution by a corporation in complete cancellation of part of its stock, and that, therefore, the distribution was made in partial liquidation of the corporation. Accordingly, respondent has included 100 percent of the gain realized from the disposition of 5,000 shares of stock in a corporation in petitioner's income under section 115(c) of the Internal Revenue Code. Petitioner contends that he did *233 not surrender the 5,000 shares of stock to the corporation at such time or under such circumstances as to permit a holding that the corporation acquired the stock for the purpose of cancellation or redemption. He contends that he sold the stock to the corporation, and that a subsequent cancellation of the stock by the corporation cannot convert the payment of the purchase price of the stock into "a distribution by a corporation in complete cancellation or redemption of a part of its stock," section 115(i) of the Internal Revenue Code, so as to affect his liability for tax upon his transaction with the corporation. In the issue presented, there are involved 7,550 shares of stock of Markle Steel Company. Respondent has determined that 2,550 shares thereof were purchased by the corporation as treasury stock, and he has included in petitioner's income only 50 percent of the gain realized upon the sale of that stock. The question relates only to the disposition of the remaining 5,000 shares. Petitioner contends that he has overpaid income tax for the year 1941. Petitioner filed his return with the collector for the first district of Texas. Findings of Fact
*234 Petitioner is a resident of Houston, Texas. In the early part of 1941, he was president of the Markle Steel Company, a Texas corporation, hereinafter referred to as the corporation. The authorized stock of the corporation was 10,000 shares of common, no par value stock, all of which was outstanding. Petitioner owned 8,900 shares, of which 8,870 shares had been held for more than two years prior to 1941. Petitioner purchased the remaining 30 shares during October, 1941. Ben H. Knipe, son-in-law of petitioner, was the vice president of the corporation, and he owned the balance of the outstanding stock, 1,100 shares. On December 2, 1941, and prior, petitioner and Knipe were the sole stockholders of the corporation. Petitioner had developed the business conducted by the corporation about 26 years prior to 1941. The business consisted of warehousing steel products and selling steel products in model sizes, shapes, and forms. In 1941, petitioner was over 80 years of age, and he desired to retire from the corporation. During September of 1941 he investigated the possibility of selling his stock to outside interests in Ohio, but he abandoned that idea in October after Knipe suggested that *235 he sell his stock to employees of the corporation. Knipe advised petitioner that the employees were not able financially to purchase the entire block of petitioner's stock and that the corporation would have to acquire the balance of the stock above the number of shares which the employees could purchase. Joseph N. Cobb, the manager of the Houston office of Barrow, Wade and Guthrie, a firm of certified public accountants, had been engaged for several years as the auditor of the books of the corporation. W. D. Sumner, in that office, had made the actual audits under Cobb's supervision. Knipe consulted Cobb about the proposal for acquiring petitioner's stock. He recommended that the corporation should purchase stock from petitioner, in whatever amount should be determined later, for the purpose of holding it as treasury stock. Cobb discussed the proposed transaction with petitioner, including the income tax upon petitioner which would result. Petitioner wished to obtain in cash $100,000 above his tax liability. The conversations with Knipe and Cobb, as set forth above, took place during October of 1941 and extended into November. Cobb explained to petitioner that his tax liability *236 would be greater if the corporation acquired his stock for the purpose of cancellation or redemption, and that his tax liability would be smaller if the corporation purchased his stock for the purpose of holding it as treasury stock. Petitioner advised Cobb that he would sell stock to the corporation to be held as treasury stock. Knipe and petitioner had worked closely together in the corporation. Knipe kept the books of the corporation. They knew that the book value of the stock was about $50 per share at the time they had their first discussions, but they felt that it would be necessary to close the books as of a certain date and determine the exact book value of the stock. On November 7, Knipe asked Cobb to have Sumner start at once to determine the book value of the stock of the corporation as of October 31, 1941. Sumner started upon this work on November 10 and completed the work on November 22. On November 16 or 17, he determined that the book value of the stock was $50.425097 per share. After the book value of the stock had been determined, certain employees of the corporation decided how much of petitioner's stock they would purchase. They decided that they would purchase *237 1,350 shares, leaving a balance of 7,550 shares to be disposed of. The employees purchased stock from Markle about one month later. After the book value of the stock had been determined and after the employees had decided how much stock they could purchase, Knipe agreed that the corporation would acquire 7,550 shares. That decision was not made until November 16 or 17. It was decided, also, that the corporation would pay some cash for stock and would transfer its real estate to petitioner. The stock of petitioner was held under two certificates, number 54 for 8,870 shares, and number 55 for 30 shares. On November 10, 1941, petitioner received a check of the corporation for $5,000. It was signed for the corporation by Knipe as vice president, and Vernon P. Williams, as secretary-treasurer. This check was given to bind the oral agreement made between petitioner and Knipe under which the corporation was to purchase stock from petitioner, the purchase price to be the book value of the stock. On December 1, Knipe delivered two checks of the corporation to petitioner in the respective amounts of $26,000 and $140,458.21. Both checks were dated December 1, 1941, and they were signed *238 by Knipe and Williams, Knipe signing as vice president. The checks cleared through the bank and were paid on December 2 and December 1, respectively. Petitioner delivered to Knipe his two certificates of stock in return for the checks, the certificates being numbered 54 and 55. Knipe took the certificates to the office of the corporation and gave them to Williams. On December 2, petitioner gave Sumner his personal check for $534 to purchase Federal stock transfer stamps. The check was made payable to Sumner, and he purchased the transfer stamps in the sum of $534 on December 2. Sumner then affixed the stamps to certificates 54 and 55, and Knipe endorsed each stamp "12-2-41". On December 1, the total cash received by petitioner from the corporation was $171,458.21. On the afternoon of December 2, Williams made out new certificates in various names, as set forth below, but none of the certificates were dated or signed. Williams did not know who should sign the stock for the corporation or what dates should be placed on the stock. He stated that he believed petitioner was no longer president because he had surrendered all of his stock. Checks had been paid dated November 10 and December *239 1, and he did not know whether to date the new stock November 10 or December 1. The certificates listed below were kept in the office of the corporation. Certificate
Number
Name
No. of Shares
56
Markle Steel Company
Treasury Stock
7,550
57
Ben H. Knipe
336
58
Victor A. Webel
114
59
Vernon P. Williams
225
60
Robert E. Elam, Jr.
225
61
Charles M. Knipe
225
62
John Towles
195
63
John Towles
30
The individuals named above were employees of the corporation. On December 26, 1941, certificates 57 to 63, inclusive, were finally executed, the date "December 26, 1941" being written on the certificates, Knipe signing as president, and Williams signing as secretary. On December 26, 1941, certificates 57 to 63, inclusive, were delivered to the persons named on each certificate. Certificate number 56, for 7,550 shares was never dated and signed by officers of the corporation. A special meeting of the stockholders and directors of the corporation was held on December 26, 1941, which was the only meeting held to consider the transactions with petitioner. At this meeting, Knipe presented a written resignation to petitioner from the office of *240 president and from the board of directors which stated that the resignation was to be effective as of October 31, 1941. The resignation of petitioner was accepted by the adoption of a resolution. Thereupon, a resolution was adopted electing Knipe to the office of president, to hold such office until his successor should be elected and qualified, and removing Knipe from the office of vice president. Charles M. Knipe was elected vice president to succeed his father, Ben H. Knipe. The corporation owned real estate in the city of Houston upon which was located its warehouse, its office building, and its garage building. It was on these premises that the corporation conducted its business. In the buildings were machinery, equipment and fixtures, and an overhead traveling crane. In the course of Knipe's conversations with petitioner, it was agreed that the corporation would deed to petitioner title to all of its property in Houston, as above described, and some property located in Brazoria County, Texas, consisting of about 320 acres. It was also agreed that petitioner would lease to the corporation the real estate and buildings in Houston. Upon the conveyance of all of its real estate, *241 together with the improvements thereon, to petitioner, the corporation would retain only its office furniture and fixtures, tools and equipment, and automobiles and trucks. The corporation would also retain its inventory of steel. Sumner was to determine the book value of the real estate and other fixed assets which were to be conveyed to petitioner, and he made that determination at the same time that he determined the book value of petitioner's stock, so that on November 16 or 17 Knipe knew that the book value of the real estate and other property which was to be conveyed to petitioner was $197,962.46, and that the book value of the fixed assets which were to be retained by the corporation was $3,355.23. In order that Sumner could determine the book values, the books were to be closed as of October 31, 1941. The balance sheet of the corporation as of that date is set forth below as it appears in respondent's Exhibit B, amendment to the charter of the corporation, which amendment was filed in the office of the Secretary of State of Texas on December 27, 1941. BALANCE SHEET AS AT OCTOBER 31, 1941 ASSETS
Cash in Banks
$186,477.71
Accounts Receivable
117,818.01
Inventory of Steel
242,376.75
Fixed Assets: To be Sold to C. N.
Markle
$240,977.67
Less - Reserve for De-
preciation
43,015.21
197,962.46
Fixed Assets - Retained.
$ 14,590.33
Less - Reserve for De-
preciation
11,235.10
3,355.23
C. N. Markle - Open Account
11,288.81
Prepaid Expenses
4,682.95
$763,961.92
LIABILITIES
Accounts Payable - Trade - statement
attached
$ 10,817.82
Reserve for Federal In-
come Taxes - 1940
$ 820.00
Reserve for Federal In-
come Taxes - 1941
230,279.24
231,099.24
Reserve for State, Local and Social
Security Taxes
17,793.89
Net Worth: Capital Stock Outstand-
ing
$200,000.00
Paid in Surplus
68,832.50
Earned Surplus - De-
cember 31, 1940
71,836.22
Profit for the Ten
Months - after Fed-
eral Income Taxes
163,582.25
504,250.97
$763,961.92
*242 John T. McCullough, an attorney, associated with the firm of Baker & Botts in Houston, looked after the affairs of the corporation. After December 2, Knipe asked McCullough to prepare the necessary instruments "to carry out the real estate phase of the transaction," that is, two deeds and a lease. McCullough had considerable experience in examination of title and the transfers of real estate. McCullough had attended one conference between petitioner and Cobb; he had several conversations with Knipe; and from these conversations he knew that the corporation was to acquire part of petitioner's stock and that the corporation was to transfer property to petitioner, and that petitioner was to lease back to the corporation its plant and business premises in Houston. However, he was not acquainted in detail with all of the phases of the transactions which had been discussed by petitioner and Knipe, and he was not acquainted with the stock book records and he did not examine the stock book records. He was given certain information. McCullough, from his experience in transferring titles to real property, knew that it would be necessary for the directors and the stockholders of the corporation *243 to adopt a resolution authorizing or ratifying the conveyance of the corporation's real estate to petitioner, and since all of petitioner's real estate was to be conveyed to petitioner he felt that the stockholders of the corporation would have to authorize the conveyances. Accordingly, he prepared a draft of minutes of a meeting of the stockholders and directors to authorize the conveyance of the real estate of the corporation to petitioner, and the leasing of the property by the corporation, among other things. He gave attention to the financial position of the corporation, and particularly to its surplus. He had the opinion that transfers of property by the corporation should be made in such way that there would not be an impairment of the capital of the corporation. He also came to the conclusion, at some time around the middle of December, that the capital stock of the corporation should be reduced. He advised Knipe on or about the 15th day of December that part of the capital stock of the corporation should be cancelled in reduction of the capital stock. Knipe said that was all right and to go ahead in the matter of reducing the capital stock. [1]
*244 McCullough drew up a deed transferring the property in Brazoria County to petitioner; a deed transferring the property in Houston, Harris County; a lease agreement between petitioner and the corporation; a final draft of minutes of a special meeting of the stockholders and directors of the corporation to be held on December 26, 1941; and an amendment to the charter of the corporation. He prepared the minutes of the meeting which was held on December 26, a few days before Christmas. The special meeting of stockholders and directors of the corporation was held on December 26, 1941. Petitioner called the meeting to order and then he retired from the meeting. The meeting was informal. Upon the retirement of the petitioner, Knipe acted as chairman of the meeting. He signed the minutes of the meeting as chairman under the words "approved", and Williams signed the minutes of the meeting as secretary under the words "a true record." At the meeting, or immediately thereafter, two deeds from the corporation were signed for the corporation by Knipe, and he also executed the lease agreement between petitioner and the corporation. The two deeds and the lease were executed on December 26, 1941, at *245 the same time the meeting was held. [2] The signatures were acknowledged by a notary public on December 26, 1941, on the three documents. The deed transferring the property located in Houston was filed for record on December 30, 1941. The lease is dated as of October 31, 1941; it was for a period of five years, ending October 31, 1946; and it provided that the annual rental to be paid by the corporation, the lessee, was $45,000. In preparing for the meeting of December 26, 1941, petitioner's attorney, McCullough, was concerned about several things. For example, he was troubled about having a majority of the authorized 10,000 shares of stock represented at the meeting. He thought that the corporation was already in a situation where its capital was impaired. [3] He thought it was essential that the records of the corporation should reflect the proper authorization of the transfer of the real estate and execution of the lease, reduction of the stock and all the different phases of the transaction. He drafted the minutes of the meeting of December 26, 1941 in such way that the minutes would show, according to his opinion, that the transactions *246 between the corporation and petitioner had taken place in several phases in such way that there was not at any time an impairment of the capital of the corporation. [4]
Respondent's exhibit A, the minutes of the meeting of December 26, 1941, is incorporated herein by reference in its entirety. The minutes, which were signed and approved by officers of the corporation, state that after the filing of the amendment to the charter, the officers are authorized to purchase from Markle 2,550 shares of the capital stock of the company for $128,584.02, based upon book value of $50.425097 per share. This statement in the minutes was an untrue statement. No cash passed from the corporation to petitioner after December 1, 1941, at which time he received two checks for the total amount of $166,458.21, as has been stated before. However, on December 26, 1941, certificate number 65 for 2,550 shares was executed by Knipe as president and Williams as secretary, in the name of "Markle Steel Company Treasury Stock." The minutes of the meeting of December 26, 1941, state that resolutions were adopted authorizing Knipe, vice president, *247 and Williams, secretary, to impress the seal of the corporation upon two deeds; and authorizing Knipe, vice president, to execute and to impress the seal of the corporation upon a lease agreement between the corporation and petitioner; and authorizing the officers of the company to accept and receive from petitioner 3925.872 shares of the capital stock of the corporation as consideration for the lands and real estate of the corporation conveyed by him. The minutes also contained a resolution that the charter of the company should be amended by amending sections 5 and 6 so as to read that the number of shares of the authorized capital stock of the corporation is 5,000 shares. New directors were named in the amendment to the charter which was adopted. Petitioner was not named as a director. On December 26, 1941, stock certificate number 64 was executed by Knipe as president and Williams as secretary, for 5,000 shares in the name of "Markle Steel Company Treasury Stock". The certificate was cancelled by writing across the face of the certificate the following: "Cancelled by charter amendment dated December 26, 1941". There was attached to the amendment of the charter of the corporation *248 a certificate of the directors which was dated December 26, 1941. The certificate was executed on December 26, 1941. The directors stated in the certificate as follows, in substance: That the corporation had disbursed $171,458.21 out of the cash in banks, and that said sum was "the agreed purchase price for 3400.255 shares of the outstanding stock of the corporation"; that the corporation had conveyed all of its real estate for an agreed consideration of $197,962.46, which was paid by the surrender to the corporation of 3,925.827 shares of its outstanding capital stock; that the corporation had received 223.873 shares of its outstanding capital stock in cancellation of an open account indebtedness owing to it by one of its former stockholders; and that by virtue of the above transactions the capital stock of the corporation outstanding in the hands of the stockholders had been reduced from 10,000 shares to 2,450 shares. Respondent's exhibit B, the amendment to the charter of the corporation, is incorporated herein by reference in its entirety. Attached to the amendment to the charter is a balance sheet of the corporation which shows the assets and liabilities of the corporation after *249 giving effect to the cancellation of an open account of petitioner with the corporation, the transfer of real estate to the petitioner, and the payment of cash to the petitioner. Although the balance sheet is said to be "as at October 31, 1941", it was in fact the balance sheet of the corporation as of December 26, 1941 after the transfer of real estate to petitioner on December 26, 1941, and after the payment of the checks of the corporation dated November 10, 1941 and December 2, 1941 in the total amount of $171,458.21, and after the closing out of an open account in the amount of $11,288.81, except for whatever other changes would have to be made during the course of business in other items up to December 26, 1941. The assets and liabilities of the corporation as of December 26, 1941, as explained above, were as follows: ASSETS
Current Assets: Cash in Bank - on demand
$ 15,019.50
Accounts receivable - Trade
117,818.01
Inventory - Steel at cost
242,376.75
Total Current Assets
$375,214.26
Fixed Assets: Office Furniture and
Fixtures
$ 4,894.53
Tools and Equipment
3,185.80
Automotive Equipment
6,510.00
Total
$14,590.33
Less - Reserve for Depre-
ciation
11,235.10
3,355.23
Prepaid Expenses: Prepaid Taxes
3,052.20
Prepaid Insurance
1,630.75
4,682.95
Total
$383,252.44
LIABILITIES
Current Liabilities: Accounts Payable - Trade
$ 10,817.82
Provision for Federal Income Taxes
- 1940 - per Return
820.00
Provision for Federal Income Taxes
- 1941 - Estimated
230,279.24
Provision for State, Local and So-
cial Security Taxes
17,793.89
Total Current Liabilities
$259,710.95
Capital: Capital Stock: Authorized - no par value
5,000 shares
$100,000.00
Less - Treasury Stock
2,550 shares
51,000.00
Outstand-
ing 2,450 shares
$ 49,000.00
Paid-in Surplus
68,832.50
Earned Surplus
5,708.99
$123,541.49
Total
$383,252.44
*250 It has been stipulated that petitioner received for 7,550 shares of stock, having a book value of $50.425097 per share, cash in the total amount of $171,458.21; real estate in the amount of $197,962.46; and the forgiveness of an indebtedness to the corporation in the amount of $11,288.81. On December 26, 1941, the corporation transferred real estate to petitioner having a value of $197,962.46 in redemption of 3,925.872 shares of the corporation's outstanding capital stock with the purpose of canceling the stock. The transfer of the property to petitioner was a distribution of assets of the corporation in the complete cancellation of a part of the corporation's capital stock. The corporation paid petitioner $182,747.02, consisting of cash in the amount of $171,458.21 and cancellation of an account in the amount of $11,288.81 in payment for 3,624.128 shares of capital stock of the corporation under an agreement to purchase that amount of stock from petitioner. At the time the corporation made payment for this amount of stock it did not intend to cancel or redeem the stock. The corporation paid for the above number of shares before December 15, 1941. On December 15, 1941 the corporation, *251 through its officers, decided to cancel 5,000 shares of capital stock in a reduction of its authorized capital stock and to hold as treasury stock only 2,550 shares. As a result of that decision 1,074.128 shares of the 3,624.128 shares which had been purchased by the corporation to be held as treasury stock were cancelled and retired. There were two transactions between petitioner and the corporation involving 7,550 shares of stock. The first transaction related to the giving of cash consideration by the corporation, and the second transaction related to the giving of consideration by the corporation consisting of transfers of real property. The first transaction took place on December 1, 1941, at which time petitioner sold 3,624.128 shares of stock to the corporation for $171,458.21 in cash and the cancellation of an indebtedness due to the corporation in the amount of $11,288.81. The second transaction took place on December 26, 1941, at which time the corporation transferred all of its real property to petitioner in complete cancellation and redemption of 3,925.872 shares of stock. Opinion The question is whether the Markle Steel Company made distributions to petitioner in *252 partial liquidation as defined in section 115(i) of the Internal Revenue Code. [5] The issue is raised under section 115(c). Respondent has determined that petitioner's gain in his transactions with the company is a short-term capital gain, 100 percent taxable with respect to the gain on 5,000 shares of stock, that being the number of shares which were cancelled and retired by the company. Respondent relies upon Dodd v. Commissioner, 131 Fed. (2d) 382; Northern Trust Co., Trustee v. Commissioner, 54 Fed. (2d) 289, certiorari denied 52 S. Ct. 458; and George F. Jones, 4 T.C. 854. Petitioner contends that he sold and the company purchased 7,550 shares of stock to be held as treasury stock, and that the cancellation of 5,000 shares of stock by the company on December 26 or 27 was separate from the transactions he had with *253 the company and represented a subsequent decision by the company to cancel stock which it held as treasury stock. Petitioner relies upon Harold F. Hadley, 1 T.C. 496; and Alpers v. Commissioner, 126 Fed. (2d) 58. Petitioner stresses the element of intent. He argues that the corporation acquired his 7,550 shares with the intent of holding them as treasury stock, and, he has offered evidence to show that his intent was to sell the stock to the corporation for holding the stock in the treasury. In Hamilton Allport, 4 T.C. 401, 403, we said "This statutory definition is not qualified by the actual or constructive intent of either the corporation or the shareholder, but is absolute within its express terms." That truism has application in this case. Petitioner received $171,458.21 in cash, $11,288.81 by way of cancellation of an indebtedness, and property having a value of $197,962.46. The questionis whether the cash and property were distributed to petitioner by the company in complete redemption and cancellation of part of its stock. That question is a question of fact. The facts are complicated in that the stockholders and directors adopted *254 a resolution on December 26 which authorized certain acts to be done and ratified acts done in terms of exchanging cash and property for stated amounts of stock at stated times. Thus, the officers of the corporation were authorized to purchase 2,550 shares of stock from petitioner for $128,584.02 after filing the amendment to the charter by which the authorized stock was reduced to 5,000 shares. The charter amendment was filed on December 27, 1941. Of course, all of the cash involved in the transaction passed prior to December 26, none was paid after that date. Another phase of the facts which adds to the complicated situation, in considering petitioner's contentions, is that the company did not issue any new certificates of stock until December 26, and it has carried only 2,550 shares of stock as treasury stock. See Borg v. International Silver Co., 11 Fed. (2d) 147, 150, where a corporation treated its own stock as treasury stock by book entries and by carring the stock in its treasury for 15 years. Petitioner argues that the minutes of the meeting of December 26 is not evidence of a transaction between him and the company, but is evidence of subsequent acts of *255 the company wholly separate from his transactions with the company. He stresses the fact that at one time he and his son-in-law, Knipe, were the chief stockholders. He argues that they could act informally and without any prior formal authorization by the stockholders and directors. This argument overlooks the legal requirements governing transfers of title of real property. The general rule is that informal contracts for the sale of an interest in land are unenforceable unless there is at least a written memorandum thereof signed by the party against whom enforcement of the contract is sought. Restatement of the Law of Contracts, Vol. 1, p. 232, par. 178. See also par. 197. Under the law of Texas, a parol sale of land can be relieved from the operation of the statute of frauds only by the presence of three factors, none of which are present here. See Hooks, et al. v. Bridgewater, 229 S.W. 1114. We must conclude that petitioner's argument is not sound to the effect that the authorization of the stockholders and directors of the corporation on December 26 to make conveyances of real property to petitioner was unrelated to the resolution adopted at the same time to cancel *256 and retire stock. As a matter of both law and fact the real property was distributed by the company at the same time that stock was cancelled. There was no contract binding on the corporation to "sell" or transfer its real property prior to December 26, 1941. Furthermore, it was understood as early as December 12 or 13 that the company would retire part of its stock. There can be no escape from the application of the statute to the distribution to petitioner of property worth $197,962.46 on December 26. That distribution was squarely within the statutory definition, section 115(i) because stock was cancelled and retired at practically the same time that the distribution was made. The above amount represented the book value of 3,925.872 shares of stock. The company retired and cancelled 5,000 shares and that must be regarded as including the stock received in exchange for the real property. The evidence does not support a finding of fact that 3,925.872 shares of stock were purchased by the company to be held in the treasury or to be reissued. The facts show quite the contrary. See George F. Jones, supra; Cohen Trust v. Commissioner, 121 Fed. (2d) 689. There *257 remains for consideration the distributions of cash to petitioner. The cancellation of the open account may be regarded as the equivalent of a distribution of cash, so that we now have to consider distributions of $182,747.02, which includes three payments by check aggregating $171,458.21. Insofar as the time of the payments may be material it is pointed out that two checks were paid on December 1, and we are satisfied from the evidence that book entries cancelling the open account were made in the early part of December. The evidence shows that at the time the cash distributions were made there was no plan or intention on the part of the company to retire and cancel any stock. On this point it is necessary to review the evidence. Petitioner decided in the first part of November, 1941, to retire from Markle Steel Company and to make his entire holding of 8,900 shares of stock available to the employees of the corporation and to the corporation. In the early part of the discussions with his son-in-law, Ben Knipe, petitioner understood that the amount of stock to be acquired by the corporation depended upon the amount which the employees would purchase. The exact book value of the *258 stock was not known until November 16 or 17, and it was not until that time that a determination was made that the employees would purchase 1,350 shares. At that time it was definitely established that the number of shares of stock to be acquired by the corporation was 7,550 shares. On that date it was known also that the total book value of 7,550 shares was $380,709.48, and that the book value of all of the real estate of the corporation, less reserves for depreciation, was $197,962.46. There was the open account of petitioner with the corporation on which $11,288.81 was due as of October 31, 1941. It was apparent, therefore, on November 16 or 17 that $171,458.21 in cash would be requiredin transactions with petitioner in the acquisition of his stock. During November, there was an understanding on the part of Knipe that stock acquired by the company could be held as treasury stock. He was acting for the corporation. The evidence shows that on December 1, when the bulk of cash was paid, the intention of both petitioner and Knipe was that stock acquired from petitioner would be held as treasury stock. It was not until December 12 or 15 that Knipe learned from McCullough that it *259 would be advisable to retire part of the stock acquired from petitioner, and agreed that part of the stock would be cancelled. Prior to that time $182,747.02 in cash had been distributed, and petitioner had delivered his stock to the company. Under these facts, the situation bears a close resemblance to the facts in Harold F. Hadley, supra, and, consistent with the holding in that case we think it must be held that the above amount of cash was not distributed in complete cancellation or redemption of part of the stock. See page 501 of the report in that case, and page 502 where it was said: * * * A decision to show retirement upon the corporate books and to file a certificate with the secretary of state, arrived at after and unconnected with the acquisition of the stock seems to us to leave such acquisition no part of liquidation proceedings. * * * The above stated amount of cash represented the book value of 3,624.128 shares of stock. It is held that shares of stock in the stated amount were purchased by the company on December 1, 1941 with the intention of holding the stock as treasury stock, and that the subsequent decision to cancel and retire 5,000 shares of stock *260 did not convert the payment of cash in the amount of $182,747.02 on and before December 1 into a distribution in cancellation of stock. The company continued to hold 2,550 shares of stock in its treasury. The action taken by the company on December 26 and 27 is regarded as having had the effect of retiring 1,074.28 shares of stock which had been held for a short time in the treasury (that being the difference between 3,624.128 shares and 2,550 shares). The holding made above is made in conformance with the holding in the Hadley case. Alpers v. Commissioner, supra, is not in point because the facts are substantially different. At the hearing respondent objected to some testimony of petitioner's witnesses to explain the ambiguities in the minutes of the meeting of December 26. The testimony was received subject to exclusion later under reserved rulings. The parties do not make any particular references on brief to the matters subject to reserved rulings. Upon due consideration the ruling is now made, that the testimony was admissible, and the objections of the respondent are overruled. See Interstate Realty Co., 25 B.T.A. 728, 734. Parol evidence is admissible to prove *261 corporate acts not recorded in the books or minutes. Hamel, Practice and Evidence Before the U.S. Board of Tax Appeals, pp. 274, 275. Under the holdings made above, respondent's determination is approved in part and reversed in part. Under Rule 50 the deficiency will be recomputed as follows: Petitioner is taxable upon 100 percent of the gain realized upon his transfer to the corporation of 3,925.872 shares of stock for which he received real estate in a partial liquidation under section 115(c). Decision will be entered under Rule 50. Footnotes
1. See transcript page 186.↩
2. See transcript, pages 79 and 189.↩
3. See transcript, page 189. ↩
4. See transcript, page 168.↩
5. As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.↩